UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **ASHLEY SAINVIL**, on behalf of herself and all others similarly situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>**GLOBALLOGIC INC.** and **ORACLE CORPORATION**,<br><br>　　　　　　　　　　Defendants. | Case No. 1:25-cv-01854<br><br><br><br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Ashley Sainvil ("Plaintiff"), through her attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant GlobalLogic Inc. ("GlobalLogic") and Oracle Corporation ("Oracle" ) (together, "Defendants"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to her own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.　　　This class action arises from Defendants' failure to protect highly sensitive data.

2.　　　Defendant GlobalLogic is a multinational engineering firm based in Santa Clara, California.[1]

---

[1] *About*, GLOBALLOGIC, https://www.globallogic.com/about/ (last visited Nov. 11, 2025).

3.      Defendant Oracle is a multinational technology and enterprise software firm.[2]

4.      GlobalLogic is an enterprise consumer of Oracle—specifically, "GlobalLogic uses Oracle E-Business Suite, a collection of applications, to manage core business functions such as finance, HR, accounts payable and receivable."[3]

5.      As such, Oracle stores a litany of highly sensitive personal identifiable information ("PII") about GlobalLogic's current and former employees. But such PII was inadequately protected and thus exposed to cybercriminals in a data breach (the "Data Breach").

6.      It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former employees' PII.

7.      On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendants' failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

8.      Plaintiff is a Data Breach victim. She brings this class action on behalf of herself, and all others harmed by Defendants' misconduct.

---

[2] *About Oracle*, Oracle, https://www.oracle.com/corporate/ (last visited Nov. 10, 2025).
[3] *Data Breach Notification*, MAINE ATTY GEN (Nov. 7, 2025)
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a69e0001-a0f8-46d9-a49d-cb01159afec2.html.

9. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, its current and former employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

10. Plaintiff, Ashley Sainvil, is a natural person and a citizen of New York. She is domiciled in New York (where she intends to remain).

11. Defendant, GlobalLogic Inc., is a stock corporation incorporated in Delaware and with its principal place of business at 2535 Augustine Drive, 5th Floor, Santa Clara, California 95054. The registered agent for service of process is Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

12. Defendant, Oracle Corporation, is a stock corporation incorporated in Delaware and with its principal place of business at 2300 Oracle Way, Austin, Texas 78741. The registered agent for service of process is Corporation Service Company dba CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and Defendants are citizens of different states. And there are over 100 putative Class Members. Defendant Oracle Corporation is a citizen of Texas.

14. This Court has personal jurisdiction over Defendants in the Austin Division of the Western District of Texas because Oracle Corporation is headquartered and has its principal place of business located in Texas and both Defendants regularly conduct business in Texas and have sufficient minimum contacts in Texas.

15. Venue is proper in the Austin Division of the Western District of Texas because Defendants' principal place of business is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

### *Defendants Collected and Stored the PII of Plaintiff and the Class*

16. Defendant GlobalLogic is a multinational engineering firm based in Santa Clara, California.[4]

17. Defendant Oracle is a multinational technology and enterprise software firm.[5]

18. GlobalLogic is an enterprise consumer of Oracle—specifically, "GlobalLogic uses Oracle E-Business Suite, a collection of applications, to manage core business functions such as finance, HR, accounts payable and receivable."[6]

19. As part of its business, Defendants receives and maintains the PII of thousands of GlobalLogic's current and former employees.

20. In collecting and maintaining the PII, Defendants agreed they would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

21. Under state and federal law, businesses like Defendants have duties to protect current and former employees' PII and to notify them about breaches.

---

[4] *About*, GLOBALLOGIC, https://www.globallogic.com/about/ (last visited Nov. 11, 2025).
[5] *About Oracle*, Oracle, https://www.oracle.com/corporate/ (last visited Nov. 10, 2025).
[6] *Data Breach Notification*, MAINE ATTY GEN (Nov. 7, 2025)
https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-
a1252b4f8318/a69e0001-a0f8-46d9-a49d-cb01159afec2.html.

22.    GlobalLogic      recognizes      these      duties,      advertising      in      its in its "Global recruitment privacy notice" that:

      a.    "We process your personal data in line with applicable data privacy requirements including, when legally required, basing the processing on an appropriate legal basis."[7]

      b.    "Such legal basis can be, for example, your consent, a legal obligation to which we are subject, or another legal basis as regulated by applicable laws."[8]

      c.    "We will process your data for no more than 3 years, unless earlier you withdraw your consent or the purpose of data processing is fulfilled."[9]

      d.    "We will transfer your data to third countries only in accordance with applicable privacy laws."[10]

      e.    "GlobalLogic applies all required safeguards, including standard data protection clauses adopted pursuant to decisions of the European Commission or relevant data protection authorities, where needed."[11]

      f.    "Access to your personal data will be given exclusively to appropriately authorized employees or associates of GlobalLogic, vendors, partners, consultant or auditors and only to the extent necessary to perform their responsibilities."[12]

---

[7] *Global recruitment privacy notice*, GLOBALLOGIC, https://www.globallogic.com/recruitment-privacy/ (last visited Nov. 10, 2025).
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

g.  "GlobalLogic respects all applicable privacy laws and your rights under the applicable legislation[.]"[13]

23.  Similarly, in its "General Privacy Policy," GlobalLogic advertises that:

a.  "We may share your data with duly authorized GlobalLogic employees or professionals who assist us in running our business and who are subject to security and confidentiality obligations."[14]

b.  "Whenever personal data is disclosed to a third party in this way, it will only be to the extent necessary to perform their duties, to perform our contract with you or for the purposes of our legitimate interests."[15]

c.  "We follow generally accepted industry standards to protect the personal information submitted to us, both during transmission and once we receive it."[16]

d.  "All personal data processed by us is stored on secure servers."[17]

*Defendants' Data Breach*

24.  On July 10, 2025, Oracle was hacked in the Data Breach—which compromised the data of its enterprise consumers (including GlobalLogic).[18]

25.  Thus far, GlobalLogic has revealed that:

---

[13] *Id.*
[14] *Privacy Policy*, GLOBALLOGIC, https://www.globallogic.com/privacy-policy/ (last visited Nov. 10, 2025).
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Data Breach Notification*, MAINE ATTY GEN (Nov. 7, 2025) https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/a69e0001-a0f8-46d9-a49d-cb01159afec2.html.

a.    "Oracle issued a security advisory on October 4, 2025, about a previously unknown zero-day exploit."[19]

b.    "GlobalLogic uses Oracle E-Business Suite, a collection of applications, to manage core business functions such as finance, HR, accounts payable and receivable."[20]

c.    "As soon as we learned of the vulnerability, GlobalLogic immediately investigated and determined that it had been exploited within our instance of Oracle."[21]

d.    "Once we made this determination, we activated our incident response procedures, engaged leading third-party cybersecurity experts to assist in a comprehensive investigation, and notified law enforcement."[22]

e.    "We also promptly applied software patches upon their release from Oracle to address the vulnerability."[23]

f.    "GlobalLogic's investigation identified access to Oracle and exfiltration on October 9, 2025."[24]

g.    "The investigation has identified the earliest date of threat actor activity as July 10, 2025, with the most recent activity occurring on August 20, 2025."[25]

---

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*

h.   "This incident did not target or impact GlobalLogic's systems outside our Oracle platform, and, based on industry reports, we are one of many Oracle customers believed to have been impacted."[26]

i.   "What Information was Involved? The personal information involved in this incident was from our Oracle platform, which includes HR information for current and former personnel. That information includes personal information collected as part of Human Resources, and could involve the following information of yours: name, address, phone number, emergency contact (name and phone number), email, date of birth, nationality, country of birth, passport information, internal GlobalLogic employee number, national identifier or tax identifier such as Social Security Number, salary information, bank account information, and routing number."[27]

26.   In total, Defendants injured at least 10,471 persons—via the exposure of their PII—in the Data Breach.[28] Upon information and belief, these 10,471 persons include the current and former employees of GlobalLogic.

27.   And yet, Defendants waited over until November 7, 2025, before they began notifying the class—a full 120 days after the Data Breach began.[29]

28.   Thus, Defendants kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

---

[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*

29.     And when Defendants did notify Plaintiff and the Class of the Data Breach, Defendants acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class:

a.     "We recommend that you review the 'Additional Important Information' section enclosed, which contains important steps you can take to protect your personal information. This section describes additional steps you can take to help protect yourself, including recommendations by the Federal Trade Commission (FTC) regarding identity theft protection and details on how to place a fraud alert or security freeze on your credit file."[30]

b.     "As an added precaution, you may want to closely monitor your personal accounts for any suspicious activity."[31]

c.     You should always remain vigilant for incidents of fraud and identity theft, especially during the next 12-24 months, by reviewing financial account statements and monitoring your credit reports for suspicious or unusual activity and immediately report any suspicious activity or incidents of identity theft."[32]

d.     "You have the right to obtain or file a police report."[33]

e.     "You can contact the Federal Trade Commission (FTC) for more information on preventing identity theft. We encourage you to report any incidents of identity theft to the FTC."[34]

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

30.     Defendants failed their duties when its inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendants caused widespread injury and monetary damages.

31.     Further, the Notice of Data Breach shows that Defendants cannot—or will not—determine the full scope of the Data Breach, as Defendants has been unable to determine precisely what information was stolen and when.

32.     Defendants have done little to remedy its Data Breach. True, Defendants have offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class Members for the injuries that Defendants inflicted upon them.

33.     Because of Defendants' Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***CL0P & the Dark Web***

34.     Worryingly, the cybercriminals that obtained Plaintiff's and Class Members' PII appear to be the notorious cybercriminal group "CL0P."[35]

35.     Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by CL0P on the Dark Web.

***Plaintiff's Experiences and Injuries***

36.     Plaintiff Ashley Sainvil is a current employee of Defendant GlobalLogic.

---

[35] *Oracle E-Business Suite Zero-Day Exploited in Widespread Extortion Campaign*, GOOGLE CLOUD (Oct. 9, 2025) https://cloud.google.com/blog/topics/threat-intelligence/oracle-ebusiness-suite-zero-day-exploitation.

37.    Thus, Defendants obtained and maintained Plaintiff's PII.

38.    As a result, Plaintiff was injured by Defendants' Data Breach.

39.    Plaintiff is very careful about the privacy and security of her PII. She does not knowingly transmit her PII over the internet in an unsafe manner.  She is careful to store any documents containing her PII in a secure location.

40.    As a condition of her employment with GlobalLogic, Defendants obtained her PII. Defendants used that PII to facilitate the employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

41.    Plaintiff provided her PII to Defendants and trusted the company would use reasonable measures to protect it according to Defendants' internal policies, as well as state and federal law. Defendants obtained and continued to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

42.    Plaintiff reasonably understood that a portion of the funds paid to Defendants (and/or derived from her employment) would be used to pay for adequate cybersecurity and protection of PII.

43.    Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

44.    Through its Data Breach, Defendants compromised Plaintiff's PII.

45.    Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendants directed Plaintiff to take those steps in its breach notice.

46.    And in the aftermath of the Data Breach, Plaintiff suffered from a spike in spam and scam text messages and phone calls.

47.    Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

48.    Because of Defendants' Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

49.    Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

50.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendants was required to adequately protect.

51.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendants' Data Breach placed Plaintiff's PII right in the hands of criminals.

52.    Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

53.    Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

54.    In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[36] Therein, Cisco reported the following:

a.    "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[37]

b.    "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[38]

c.    89% of consumers stated that "I care about data privacy."[39]

d.    83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[40]

e.    51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[41]

f.    75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[42]

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

---

[36] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[37] *Id*. at 3.
[38] *Id*.
[39] *Id*. at 9.
[40] *Id*.
[41] *Id*.
[42] *Id*. at 11.

55. Because of Defendants' failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

  a.  loss of the opportunity to control how their PII is used;

  b.  diminution in value of their PII;

  c.  compromise and continuing publication of their PII;

  d.  out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

  e.  lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

  f.  delay in receipt of tax refund monies;

  g.  unauthorized use of their stolen PII; and

  h.  continued risk to their PII—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the PII.

56. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

57. The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

58.    It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

59.    One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data— first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

60.    The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

61.    In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

62.    Defendants disclosed the PII of Plaintiff and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

63.    Defendants' failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

**Defendants Knew—Or Should Have Known—of the Risk of a Data Breach**

64.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

65.    In 2024, a record 3,158 data breaches occurred—exposing approximately 1,350,835,988 sensitive records (i.e., 211% increase year over year).[43]

66.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[44]

67.    Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendant.

**Defendants Failed to Follow FTC Guidelines**

68.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines

---

[43] *2024 Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2025), https://www.idtheftcenter.org/wp-content/uploads/2025/02/ITRC_2024DataBreachReport.pdf.

[44] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

69.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[45]  The FTC declared that, *inter alia*, businesses must:

    a.    protect the personal customer information that they keep;

    b.    properly dispose of personal information that is no longer needed;

    c.    encrypt information stored on computer networks;

    d.    understand their network's vulnerabilities; and

    e.    implement policies to correct security problems.

70.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

71.    Furthermore, the FTC explains that companies must:

    a.    not maintain information longer than is needed to authorize a transaction;

    b.    limit access to sensitive data;

    c.    require complex passwords to be used on networks;

    d.    use industry-tested methods for security;

    e.    monitor for suspicious activity on the network; and

    f.    verify that third-party service providers use reasonable security measures.

72.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and

---

[45] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

73.     In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

74.     Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

75.     Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

76.     Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04)

and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

77.    These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

78.    Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach that impacted GlobalLogic in July 2025, including all those individuals who received notice of the breach.

79.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendants has a controlling interest, any Defendants officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

80.    Plaintiff reserves the right to amend the class definition.

81.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

82.    <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

83.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 10,471 members.

84.    <u>Typicality</u>. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

85.    <u>Adequacy</u>. Plaintiff will fairly and adequately protect the proposed Class's common interests. Her interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

86.    <u>Commonality and Predominance</u>. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a.    if Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.    if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    if Defendants were negligent in maintaining, protecting, and securing PII;

d.    if Defendants breached contract promises to safeguard Plaintiff and the Class's PII;

e.     if Defendants took reasonable measures to determine the extent of the Data

Breach after discovering it;

f.     if Defendants' Breach Notice was reasonable;

g.     if the Data Breach caused Plaintiff and the Class injuries;

h.     what the proper damages measure is; and

i.     if Plaintiff and the Class are entitled to damages, treble damages, and or

injunctive relief.

87.     <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## **FIRST CAUSE OF ACTION**
### **Negligence**
### **(On Behalf of Plaintiff and the Class)**

88.     Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

89.     Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

90.     Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

91.     Defendants have full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

92.     Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiff and Class Members' PII.

93.     Defendants owed—to Plaintiff and Class Members—at least the following duties to:

    a.    exercise reasonable care in handling and using the PII in its care and custody;

    b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

    c.    promptly detect attempts at unauthorized access;

    d.    notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

94.     Thus, Defendants owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

95.     Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

96.     Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

97.     Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendant.

98.     The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

99.     PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

100.    Defendants improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

101.    Defendants breached these duties as evidenced by the Data Breach.

102.    Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

       a.    disclosing and providing access to this information to third parties and

       b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

103.    Defendants breached their duties by failing to exercise reasonable care in supervising their agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

104.    Defendants further breached their duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

105.    Defendants have admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

106.    As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

107.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

108.    Defendants' breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Negligence *per se*
### (On Behalf of Plaintiff and the Class)

109.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

110.    Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

111.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff and the Class Members' sensitive PII.

112.    Defendants breached their respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

113.    Defendants violated their duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

114.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

115.    But for Defendants' wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

116.    The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that Defendants was failing to meet their duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

117.    Defendants' various violations and their failure to comply with applicable laws and regulations constitutes negligence *per se*.

118.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

**THIRD CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

119.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

120.    Plaintiff and Class Members either directly contracted with Defendants or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

121.    Plaintiff and Class Members (or their third-party agents) were required to provide their PII to Defendants as a condition of receiving employment provided by GlobalLogic. Plaintiff and Class Members (or their third-party agents) provided their PII to Defendants or its third-party agents in exchange for GlobalLogic's employment.

122.    The contracts entered into by Plaintiff's and Class Members' agents (for example, their employers), were made for the direct benefit of Plaintiff and the Class.

123.    Plaintiff and Class Members (or their third-party agents) reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

124.    Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and its internal policies.

125.    Plaintiff and the Class Members (or their third-party agents) accepted Defendants' offers by disclosing their PII to Defendants or their third-party agents in exchange for employment.

126.    In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

127.    In its Privacy Policy, Defendants represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

128.    Implicit in the parties' agreement was that Defendants would provide Plaintiff and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

129.    After all, Plaintiff and Class Members (or their third-party agents) would not have entrusted their PII to Defendants (or their third-party agents) in the absence of such an agreement with Defendant.

130.    Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

131.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

132.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

133.    Defendants materially breached the contracts it entered with Plaintiff and Class Members (or their third-party agents) by:

   a.    failing to safeguard their information;

   b.    failing to notify them promptly of the intrusion into its computer systems that compromised such information.

   c.    failing to comply with industry standards;

   d.    failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.     failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

134.    In these and other ways, Defendants violated their duty of good faith and fair dealing.

135.    Defendants' material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

136.    And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

137.    Plaintiff and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**FOURTH CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

138.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

139.    Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

140.    Defendants owed a duty to its current and former employees, including Plaintiff and the Class, to keep this information confidential.

141.    The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII is highly offensive to a reasonable person.

142.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be

kept confidential and protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

143.   The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

144.   Defendants acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

145.   Defendants acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

146.   Acting with knowledge, Defendants had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

147.   As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

148.   And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

149.   Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

150.    Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

151.    In addition to injunctive relief, Plaintiff, on behalf of herself and the other Class Members, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

152.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

153.    This claim is pleaded in the alternative to the breach of implied contract claim.

154.    Plaintiff and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendants benefitted from (1) using their PII to facilitate employment, and (2) using their labor to derive profit.

155.    Defendants appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

156.    Plaintiff and Class Members (or their third-party agents) reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and its internal policies.

157.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

158.    Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid its data security

obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

159.    Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII and (2) employment because Defendants failed to adequately protect their PII.

160.    Plaintiff and Class Members have no adequate remedy at law.

161.    Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## SIXTH CAUSE OF ACTION
### Breach of Fiduciary Duty
### (On Behalf of Plaintiff and the Class)

162.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

163.    Given the relationship between Defendants and Plaintiff and Class Members, where Defendants became guardian of Plaintiff's and Class Members' PII, Defendants became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

164.    Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendants' relationship with them—especially to secure their PII.

165.    Because of the highly sensitive nature of the PII, Plaintiff and Class Members (or their third-party agents) would not have entrusted Defendant, or anyone in Defendants' position, to retain their PII had they known the reality of Defendants' inadequate data security practices.

166.    Defendants breached their fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiff's and Class Members' PII.

167.    Defendants also breached their fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

168.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing her counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D.    Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.      Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

F.      Awarding attorneys' fees and costs, as allowed by law;

G.      Awarding prejudgment and post-judgment interest, as provided by law;

H.      Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.      Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Dated:  November 17, 2025           Respectfully submitted,

*/s/ Joe Kendall*

JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219
Telephone:  214/744-3000 / 214/744-3015 (fax)
jkendall@kendalllawgroup.com

Lynn A. Toops*
Amina A. Thomas*
COHENMALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
ltoops@cohenmalad.com
athomas@cohenmalad.com

*Pro hac vice forthcoming*

**Attorneys for Plaintiff and the Proposed Class**